UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| MARY RHODE, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 07-1225 |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration | ) |
| Defendant. | ) |

**ORDER**

This matter is now before the Court on Plaintiff Mary Rhode's Motion for Summary Judgment and the Defendant Commissioner's Motion for Summary Affirmance. For the reasons set forth below, Rhode's Motion for Summary Judgment [#20] is DENIED, and the Commissioner's Motion to Affirm [#25] is GRANTED.

**Background**

**Jurisdiction**

Rhode seeks judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner") that she was not disabled within the meaning of the Social Security Act ("Act"), and denying her application for Disability Insurance Benefits ("DIB") under Title II of the Act. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

**Procedural Background**

On April 4, 2005, Rhode filed an application for DIB, alleging that seizures limited her ability to work and stated that June 15, 2004, was the date her disability began. (Tr.

67, 82).  After a review of her claim, the Social Security Administration denied her claim initially and on reconsideration. (Tr. 29-30).   Thereafter, Rhode requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 42).  After a hearing held on November 21, 2006, the ALJ concluded that Rhode was not disabled within the meaning of the Act. (Tr. 17-25).  Rhode requested review of the ALJ's decision by the Appeals Council. (Tr. 12).   The Appeals Council denied review of the ALJ's decision on June 29, 2007, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-9).  This appeal followed.

In her appeal, Rhode argues that ALJ erred in two respects: (1) that the RFC formulated by the ALJ did not reflect the limitation documented in the evidence of record and is not consistent with the ALJ's own findings regarding the severity of Rhode's depression; and (2) that the ALJ did not give Rhode and her counsel an opportunity to respond to allegations of misconduct prior to reaching a decision that maligns Rhode's credibility and counsel's integrity.  The Court will address each argument after it summarizes the factual background of this action.

**Education/ work history**

Rhode was born in 1962. (Tr. 67).  She graduated from high school. (Tr. 424.) She was most recently employed as a sales clerk at a children's clothing store. (Tr. 425). Rhode has not worked since April 2004. (Tr. 425).  She stopped working after the state revoked her license, following her third seizure-related traffic accident. (Tr. 425-26).

**Medical background**

The Court will only summarize Rhode's relevant medical history pertaining to her mental limitations, including both epilepsy and depression, because she does not challenge the ALJ's finding regarding her physical residual functional capacity ("RFC").

I.    Epilepsy/ seizures

In 1996, Rhode was diagnosed with temporal lobe epilepsy. (Tr. 340-41, 348). Rhode has received treatment for her epilepsy, including anticonvulsant medication, from Dr. Thomas J. Kelly, a neurologist at the University of Chicago, through the date of the ALJ's decision. (Tr. 333, 335).

In March 1997, Rhode began seeing Dr. Elizabeth Vliet, who diagnosed her with an atypical seizure disorder caused by cyclical hormonal changes. (Tr. 165). Dr. Vliet treated the hormone fluctuations by prescribing a birth control pill and Dr. Vliet noted that Rhode's seizure activity appeared to be controlled and stable with medication. (Tr. 164). Dr. Vliet's treatment notes reflected no further seizure activity until May 6, 2002. (Tr. 156-63). On May 6, 2002, Dr. Vliet stated that Rhode reported having "spells" again when she stopped taking her medications at the proper time because she was "working around the clock." (Tr. 155).

On August 9, 2002, Dr. Vliet noted that Rhode had experienced "a couple" seizures in June and July because she forgot to take her medication on time, but the seizures had stabilized after Dr. Kelly increased the dosage of her medication. (Tr. 154). On December 4, 2002, Rhode confirmed to Dr. Kelly that she had experienced two seizures since June, consisting of speech arrest, a shaking right hand, and nausea. (Tr. 328). Rhode attributed these episodes to being unable to take her medication at the

proper time. (Tr. 328). Dr. Kelly advised Rhode not to drive until she had been without seizures for six months. (Tr. 329).

On June 6, 2004, Rhode was in an automobile accident and Dr. Kelly opined that she "probably" had a seizure while driving as a result of not taking her anti-seizure medication on time. (Tr. 319). On June 15, 2004, Dr. Kelly increased her anti-seizure medication and on November 6, 2004, Rhode reported that she knew of no seizure episodes since the medication adjustment. (Tr. 319-320; 136-37).

On December 7, 2004, Dr. Kelly stated that Ms. Rhode had not experienced any further seizures since June of that year, but that he was still in the process of maximizing the level of her anti-seizure medication. (Tr. 315-16). Rhode told Dr. Vliet that she had experienced two further seizures in December 2004. (Tr. 133).

On May 12, 2005, Dr. Kelly wrote that Rhode was under his care for temporal lobe epilepsy, and that deteriorated seizure control over the past two years had kept her from driving. (Tr. 255). Dr. Kelly examined Rhode on June 6, 2005, where Rhode reported experiencing seizures in December 2004, April 2005, and May 2005. (Tr. 307-311). Rhode described her seizures as characterized by speech arrest, right hand shaking, and urinary incontinence (in May 2005). (Tr. 307-311). On August 29, 2005, Dr. Kelly again wrote that he had instructed Rhode not to drive due to increased seizure frequency, and that she could not work at occupations involving hazardous machinery or a risk of falling. (Tr. 265). He added that her serum anticonvulsant levels indicated that she was compliant with her medication. (Tr. 265). He wrote another letter stating that epilepsy had affected her ability to hold a job "due to the long distance she needs to travel to and from work." (Tr. 266).

4

On September 7, 2005, Dr. Vliet noted that Rhode had experienced no further seizures until she was off her birth control pill. (Tr. 269). Dr. Vliet instructed Rhode not to stop taking the birth control pill unless she was forced to do so by menstrual symptoms, and that she could take the medication "for a year or more without a break and without adverse medical effects if she needs to in order to prevent hormone fluctuations that trigger her seizures." (Tr. 269).

On September 16, 2005, Dr. Kelly increased the dosage of Rhode's anti-seizure medication after she experienced a seizure in August 2005. (Tr. 304). On November 18, 2005, Dr. Kelly indicated that Rhode had two separate seizure disorders, but was doing well and had not experienced any seizure activity since her medication was adjusted in September 2005. (Tr. 295-96).

On December 5, 2005, Dr. Vliet wrote a letter in support of Rhode's application for benefits. (Tr. 267-68). Dr. Vliet stated that she treated Rhode for hormonal problems which precipitated seizures, but was not treating Rhode for the seizures themselves. (Tr. 267). Dr. Vliet further stated that she was working with Rhode to achieve a tolerable hormonal balance. (Tr. 267). Dr. Vilet noted that "other seizures which occur at random" made it impossible for her to continue with her job as a child care worker, because she could not hold a driver's license to travel to work sites, employers were reluctant to hire someone "who might be subject to seizures," and there were limited work opportunities in the town where she lived. (Tr. 267-68). Dr. Vliet added that Rhode was subject to short term memory loss, and tended to drop things, which were "not characteristics that employers look for." (Tr. 267). Dr. Vliet stated it was medically necessary for Rhode to stop her birth control pill periodically, and that she had reported

5

seizures "when off the BCP to have a period," but that she and Rhode were working on adjusting a supplement to reduce such seizure activity. (Tr. 267).

Before an appointment scheduled for February 8, 2006, Dr. Vliet asked Rhode to fill out a progress summary. (Tr. 408). In the progress summary, Rhode summarized her medications, and stated that she "can't think of anything that is not better right now." (Tr. 408). However, in a section marked "Questions and Concerns to address at appointment," Rhode hand wrote:

> To get social security, the attorney wants me to say I am not feeling better and as bad as possible, and to have it on record. Depression, more headaches, and seizures. I am doing to [sic] well to get social security. They think I can still go back and do my same job I was doing. One or two seizures a month, they think is not bad, and nothing to worry about. If they think that, then they can give me back my license then. But with tests, Dr. bills, hospital bills, and prescription [sic], the money is getting short, and my parents are helping as much as possible. (Tr. 408).

Treatment notes from the February 8, 2006, appointment reflect that Rhode reported that she was doing well, and had no negative side effects from her medication. (Tr. 407). Since Dr. Vliet had identified stopping her birth control pill as a seizure trigger, Rhode has been able to remain on the birth control pill continuously. (Tr. 407).

On April 25, 2006, Dr. Kelly noted that Rhode had not experienced any seizures since her medication had been adjusted in August 2005, and that she reported no side effects from the medication. (Tr. 368). He concluded that her seizures were well-controlled. (Tr. 368).

Dr. Kelly completed a seizure RFC assessment of Rhode on July 5, 2006. (Tr. 377-80). He indicated that she experienced about one seizure a month until August 2005, but had been seizure-free since then. (Tr. 377). He indicated she experienced confusion about a seizure and "probably" would disrupt her daily activities for at least an

6

hour following the seizure and that a seizure would probably disrupt any co-workers if it happened on the job. (Tr. 378-79). Dr. Kelly indicated that Rhode was compliant with taking her medication. (Tr. 378). He noted that she was capable of high stress work, because stress "should not significantly affect [the] seizure frequency." (Tr. 380). Dr. Kelly stated that Rhode could not work at heights or with power machines, but would require no more supervision than an unimpaired worker, and would not need to take unscheduled breaks. (Tr. 379, 380). Dr. Kelly stated that Rhode had no limitations in sitting, standing, walking, or manipulations, but should avoid climbing, unprotected heights and dangerous machinery. (Tr. 380). Further, Rhode could drive when she was seizure-free for six months with medication, and could take the bus by herself. (Tr. 379). Dr. Kelly did not indicate that Rhode had any mental problems associated with her seizure disorders.

On August 1, 2006, Rhode told Dr. Vliet that she experienced a mild seizure in July 2006. (Tr. 405-06). Dr. Vliet concluded that Rhode had ovulated despite taking birth control, and the fluctuation in estrogen triggered the seizure, as it had consistently done in the past. (Tr. 405). Dr. Vliet concluded that Rhode was not taking her medication in proper sequence, and also concluded that an anti-depressant that she was taking was making the hormone drugs less effective. (Tr. 405).

On October 23, 2006, Rhode told Dr. Kelly that she had again experienced seizures in May, July, and August 2006. (Tr. 397). He adjusted her medication. (Tr. 393, 398). On February 8, 2007, Dr. Vliet stated that Rhode was doing "very well" on her revised medical regime, her mood was good, reported no seizures since her last visit, but that she still could not drive. (Tr. 402). Rhode denied any negative side effects or changes in her health. (Tr. 402).

7

II.     <u>Depression</u>

On April 4, 2006, Dr. Travis Swink, Rhode's primary care physician, noted a "new onset of depression," which he attributed to medication that she was taking for headache control for the past year. (Tr. 274). Dr. Swink indicated that Rhode thought her depression was related to the fact that she could not drive and had been unable to get a job. (Tr. 274). Dr. Swink observed that Rhode had a flat affect and response, and he recommended a complete psychological examination. (Tr. 274). Dr. Swink placed Rhode on Lexapro, an anti-depressant. (Tr. 274). On April 18, 2006, Dr. Swink noted that "she has been doing very well" with Lexapro. (Tr. 274).

On April 12, 2006 Mark Wichman, a social worker and licensed psychological counselor, conducted a mental health assessment of Rhode. (Tr. 276-285). Rhode reported that she was depressed because her seizure disorder kept her from holding a job. (Tr. 276). Mr. Wichman noted that Rhode seemed to process information slowly and had some difficulty concentrating and focusing. (Tr. 276).

In her comprehensive mental health assessment for Mr. Wichman, she indicated that she experienced depression and frustration daily, and occasionally experienced irritability, anxiety, and memory impairment. (Tr. 277). Rhode stated she had left her job as a sales assistant due to her seizure disorder and the risk of falling. (Tr. 280). Rhode indicated that she was able to spend some time each day in productive activity, budget and manage her own funds, shop, engage in social activities and relate well to her family, express emotions appropriately, and maintain her own environment through activities such as cooking, cleaning, and doing laundry. (Tr. 278). She could care for her personal needs, spend time reading books, watching television, and visiting with

friends. (Tr. 279). Based on this information, Mr. Wichman diagnosed Rhode with a major depressive disorder, mild, recurrent. (Tr. 284).

Dr. Bhaskar Damera conducted a psychiatric evaluation of Rhode on June 15, 2006. (Tr. 376). Dr. Damera noted that Rhode reported becoming upset at seeing large medical bills, and had become more upset, depressed, and moody over the last three months. (Tr. 376). Rhode reported that her Lexapro antidepressant medication was very helpful. (Tr. 376). A mental examination revealed that Rhode was alert, spontaneous, and fully oriented. (Tr. 376). Rhode responded to questions very well, displayed no evidence of psychosis, and had an intact memory. (Tr. 376). Dr. Damera diagnosed Rhode with adjustment disorder with depression. (Tr. 376).

On July 13, 2006, Rhode told Dr. Damera that she had increased anxiety because she could not pay her bills. (Tr. 383). Her depression was not disabling on its own. (Tr. 383). On August 31, 2006, Dr. Damera indicated that Rhode was not receiving financial assistance. (Tr. 382). He adjusted her medication to include Xanax and, when he saw her again on September 28, 2006, he indicated that she was doing "very well" with the new medication, did not have much anxiety, and was "pretty stable." (Tr. 381, 382). Dr. Damera indicated that there was nothing more he could do in terms of medication; her main problems were an absence of financial assistance and a medical card. (Tr. 381).

**Administrative Hearing**

At the November 21, 2006, administrative hearing, Rhode testified that she stopped working because she could not manage the commute without a car and she had lost her driver's license after her third seizure-related car accident. (Tr. 426-27). Rhode had not looked for another job because it would be too much of a burden to ask

9

her parents to drive her to work. (Tr. 427). She stated that she still could not work because she could not remember what she had to do each day, and she was afraid of having a seizure or falling. (Tr. 431). She experienced short-term memory problems, and sometimes could not remember where she was. (Tr. 436). She was depressed because she did not know how she would pay her bills. (Tr. 438-39).

Rhode testified that she could care for her personal needs, care for her own condominium, help her father with yard work, go shopping with her mother, and enjoyed reading, watching television, and playing with her nephews. (Tr. 432, 434). She did not go shopping on her own because she lacked transportation. (Tr. 441). She did not socialize much, largely because of a lack of transportation, through she saw her parents daily. (Tr. 432-33, 441). She went to church weekly, and attended monthly meetings of a church club. (Tr. 433).

Rhode's mother testified at the hearing that Rhode had been in three car accidents as a result of seizures. (Tr. 456-57). She testified that Rhode could not work because of unpredictable seizures, that she had quit work because she could no longer drive, and that she moved to the town where her parents lived because there was no public transportation available and her parents could drive her to doctor appointments. (Tr. 457-58). Rhode's mother affirmed that Rhode had experienced five seizures during 2006, and further testified that Rhode experienced memory loss associated with the seizures and did not know where she was. (Tr. 458-60). Rhode's mother testified that Rhode had memory problems not associated with her seizures, such as not remembering plans to go shopping from one day to the next and sometimes forgetting to pay bills. (Tr. 463-64, 466). However, other than needing help with transportation, Rhode's mother testified that Rhode could "pretty much" take care of herself. (Tr. 467).

At the hearing, a vocational export ("VE") testified in response to a hypothetical question from the ALJ that a person of Rhode's age, education, and background, who would experience a seizure at work every one or two months, and who was limited to tasks of moderate complexity, could not perform Rhode's past relevant work as a babysitter, could still perform some of Rhode's past relevant work as a home health aide as long as it did not involve transferring patients, and could perform her past relevant work as a sales associate and telemarketer. (Tr. 444-45, referencing Tr. 123). If the hypothetical person did not show up for work three or more times a month, most employers would find that "a real problem" but if the hypothetical person had to leave once a month or once every two months, she would not be precluded from a sales clerk job. (Tr. 446-47).

The VE testified that even if the seizure disrupted co-workers for about an hour, and the person had to leave work after the seizure, Rhode's past work as a sales clerk and telemarketer would not be precluded. (Tr. 446). The VE also testified that while Rhode performed her job as a sales clerk at the semi-skilled level, there were also thousands of unskilled sales clerk positions. (Tr. 449). Alternatively, the VE stated that Rhode could perform other unskilled jobs in the economy, including but not limited to light and medium housekeeper. (Tr. 451-52). The VE added that those jobs did not require a lot of concentration, and memory would be even less important that in Rhode's past relevant work. (Tr. 452-53).

The ALJ issued his decision on April 12, 2007, concluding that Rhode was not disabled within the meaning of the Act. (Tr. 17-25). The ALJ concluded that Rhode could perform medium work that did not involve exposure to hazards or require climbing

ladders, ropes, or scaffolding. (Tr. 21). The ALJ further determined that Rhode could perform her past relevant work as a sales clerk and telemarketer. (Tr. 24).

The ALJ found that Rhode was severely impaired by epilepsy and depression because these impairments more than minimally impact Rhode's ability to perform work related activity. (Tr. 19). However, the ALJ did not find Rhode's statements concerning the intensity, persistence, and limiting effects of the symptoms to be entirely credible. (Tr. 22). The ALJ noted that the record indicates that Rhode was counseled by her attorney to represent her condition to her treating doctors as being worse that it actually was in order to increase her chances of obtaining benefits. (Tr. 22).

## Discussion

In order to be entitled to DIB, a plaintiff must show that her inability to work is medical in nature. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§

404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps one through four. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show that the plaintiff has the ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. *Anderson v. Bessemer City*, 470 U.S.

564, 573 (1985); *Imani v. Heckler*, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988 (1986).

In her appeal, Rhode argues that ALJ erred in two respects. Both of these arguments will be addressed in turn.

**1.    Whether the ALJ's RFC formulation reflected the limitation documented in the evidence of record and was consistent with the ALJ's findings regarding the severity of Rhode's depression**

It is undisputed that Rhode satisfies the first step of the Commissioner's five-step test to determine disability because she has not engaged in substantial gainful activity since April 2004. To determine whether Rhodes depression was "severe," under step two, the ALJ stated he followed the specific procedure under the Social Security Regulations for evaluating the severity of an adult claimant's mental impairments. (Tr. 20). This procedure requires the ALJ to list the signs, symptoms, and other medical findings which substantiate the presence of one or more medically determinable mental impairments, and then to rate the degree of functional limitation resulting from such impairments. (20 CFR 404.1520a). The ALJ stated he evaluated Rhode under the Section 12.04 Affective Disorders Listing.

> The ALJ summarized the medical information he reviewed:
>
> In April of 2006 she was diagnosed by therapist Mark Wichman with major depressive disorder, mild, recurrent (Exhibit 8F, p. 10). She was prescribed medication and her condition was "much improved" (Id. at 13). The claimant has a diagnosis of depression and is seen by Dr. Bhaskar Damera, M.D. She takes Xanax and does very well on this medication according to a September 28, 2006[,] progress note (Exhibit 14F, p.1). She reports financial concerns and struggling with her social security application but seems stable according to her doctor (Id.). In June of 2006 she indicated that her depression and anxiety focused around unpaid medical bills. Her condition had improved by July of 2006 to the point that she reported not feeling depressed to the extent that she was disabled

due to depression alone (Exhibit 14F, p.30.  As of November 2006, right before she went with her parents to Arizona for the winter, her medication was changed from Lexipro to Celexa for cost reasons and her condition was otherwise stable (Exhibit 18F, p. 2).  (Tr. 20).

Using the above procedure, the ALJ determined that Rhode satisfied the "A" criteria because she reported depressive symptoms, anhedonia, and was treated medically for the condition and reports improvement with the treatment. (Tr. 20). However, the ALJ determined that neither the "B" nor "C" criteria under Listing 12.04 were met.  Regarding the "B" criteria, the ALJ determined that Rhode has a slight limitation in social functioning and activities of daily living on the basis of her overall ability to care for herself but that the evidence did not establish that Rhode had experienced extended episodes of decompensation. (Tr. 20).  The ALJ further determined that Rhode's depression did not meet the "C" criteria because there were no repeated episodes of extended decompensation; her statements and testimony indicate sufficient adaptability to maintain extensive daily activities; and she is able to function outside of her home. (Tr. 21).

The ALJ stated that he compared the evidence regarding Rhode's physical impairments with the criteria of the pertinent listings, and considered the combined effect of her physical and mental impairments, and concluded that she does not have an impairment or combination of impairments that meet the criteria of any listed impairment. (Tr. 21).  The ALJ noted that his conclusions are supported by the findings of the state agency medical and psychological consultants. (Tr. 21).

Rhode argues that the ALJ erred by not including mental limitations relating to her depression in his determination of her RFC, despite finding that her depression was a severe impairment.  The Court disagrees because it finds that the ALJ considered

15

Rhode's mental limitations regarding her depression and properly applied the Agency's special procedure for determining whether a mental impairment is severe. After determining that Rhode satisfied the "A" criteria but not the "B" or "C" criteria, the regulations direct the ALJ to determine the claimant's RFC, which is "what [the claimant] can do despite [her] limitations." 20 C.F.R. § 404.1545. In determining disability, it is only the RFC finding that matters. 20 C.F.R. § 404.1520a(d)(3).

The ALJ did not disregard the Rhode's claimed symptoms. He evaluated her claims against the medical evidence in the record to determine whether her impairments were severe. In evaluating Rhode's depression, the ALJ considered Mr. Wichman's and Dr. Damera's assessments, including their observations that Rhode's condition improved with medication. Rhode's own representations that she could not work because she could not drive to get to a job, which is not a proper consideration in determining whether a claimant can perform her past relevant work, also contributed to his assessment.

For the foregoing reasons, the Court concludes that the ALJ's decision was supported by substantial evidence. Under these circumstances, and in conjunction with the ALJ's determination that all of Rhode's impairment allegations were not credible, the ALJ reasonably did not incorporate any mental limitations regarding her depression in calculating Rhode's RFC.

**2.    Whether the ALJ had to give Rhode and her counsel an opportunity to respond to allegations of misconduct prior to reaching a decision that maligns Rhode's credibility and counsel's integrity**

The ALJ noted in his decision that there was evidence that Rhode's counsel influenced her to be less than truthful about her degree of physical limitation. Rhode

asserts, without citation to legal authority, that the ALJ should have first provided her and her counsel an opportunity to appear at a supplemental hearing prior to issuing a final decision that alleged this misconduct.

The statement at issue, along with other medical records from Dr. Vliet, was submitted to the ALJ after the administrative hearing under a cover letter from Rhode's attorney. (Tr. 401). Therefore, Rhode's counsel had an opportunity to examine and assess this document prior to its submission.

The Commissioner has promulgated a procedural manual, the *Hearings, Appeals and Litigation Law Manual* ("HALLEX") that sets forth safeguards and guidance for administrative proceedings, including post-hearing evidence. Under HALLEX, an ALJ "must proffer all posthearing evidence unless … the evidence was submitted by the claimant or the claimant's representative and there is no other claimant to the hearing." HALLEX I-2-7-20(A). Because this evidence was submitted by Rhode's attorney, the ALJ was entitled to mark the evidence as an exhibit and place it in Rhode's file without further action. HALLEX I-2-7-20(B).

ALJs are required to evaluate a claimant's credibility. 20 C.F.R. § 404.1529. The Court finds that it was predictable that the ALJ would find Rhode's handwritten statement detracted from her credibility. If counsel believed there was an innocent construction to this statement, he could have contacted Rhode and obtained an affidavit clarifying or explaining her comment to Dr. Vliet and submitted it along with the medical records. In addition, he could have submitted his own affidavit, explaining his alleged advice to Rhode. However, Rhode's counsel did nothing until receiving an unfavorable decision from the ALJ. Rhode and her counsel may not wait until the ALJ issues his decision and then insist that they are entitled to a new hearing to rebut the ALJ's

conclusions. Derivative evidence, including opinions designed to rebut the ALJ but based on evidence already in the administrative record, do not entitle a plaintiff to a remand. *See Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997); *Sample v. Shalala,* 999 F.2d 1138, 1144 (7th Cir. 1993).

## CONCLUSION

For the reasons set forth above, Rhode's Motion for Summary Judgment [#20] is DENIED, and the Commissioner's Motion to Affirm [#25] is GRANTED.

ENTERED this 3rd day of March, 2009.

/s Michael M. Mihm
Michael M. Mihm
United States District Judge